# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

DAVID GIDDINGS,

        Plaintiff,

    v.                                    Case No. 07-CV-370

PRINCIPAL FINANCIAL GROUP, INC.,
PRINCIPAL FINANCIAL ADVISORS, INC.,
and PRINCIPAL LIFE INSURANCE COMPANY,

        Defendants.

_____

# ORDER

On March 20, 2007, plaintiff David Giddings filed a Complaint (Docket #1, Ex. A) in the Washington County Circuit Court, alleging defendants (referred to collectively as "Principal")[1] breached a contract with plaintiff, defamed plaintiff, and tortiously interfered with plaintiff's business relations with third parties. Defendants, one of which is incorporated in Delaware, the other two of which are incorporated in Iowa, and all having their principal place of business located in Des Moines, Iowa, thereafter removed this action to the U.S. District Court for the Eastern District of Wisconsin, pursuant to 28 U.S.C. § 1441. Defendants allege jurisdiction lies under 28 § U.S.C. § 1332, as the action is between citizens of different states, and the amount in controversy exceeds $75,000. (Notice of Removal ¶¶ 9-13). On April 22,

---

[1]Principal Life and Principal Financial Advisors ("PFA") are separate, wholly owned subsidies of Principal Financial Group ("PFG"). (Cert. of Interest, Docket #3, at 2-3). Defendants dispute that PFA and PFG are proper parties to this action. (Defs.' Br. Supp. Mot. S.J. at 14). Plaintiff argues, unconvincingly, that PFG is a proper party, and apparently acquiesces to the assertion that PFA is not a proper party. (Pl.'s Br. Opp. Mot. S.J. at 11-12). Because of the court's ultimate ruling on defendant's motion, this issue need not be resolved.

2008, defendants filed a Motion for Summary Judgment. (Docket #27). After carefully considering the parties' submissions (including Plaintiff's Sur-Reply (Docket #55)), the court finds that defendants are entitled to summary judgment on each count set forth in the complaint.

## I. FACTS

Pursuant to a 1996 contract, plaintiff became a career agent and independent contractor for Principal Life. (DPFOF ¶ 8-9). The contract was at-will, and provided either party the right to terminate the contract at any time for any reason, and at the same time gave Principal Life the right to terminate plaintiff's authority to sell its products at any time. (Id. ¶ 11). Plaintiff was also a "registered representative" for Princor Financial Services Corp. ("Princor"), which is an affiliate of Principal. (Id. ¶ 12). As a registered representative, plaintiff was able to buy and sell securities and investment related products through Princor. (Id.). On September 6, 2006, Andrew Decker, one of plaintiff's clients, authorized plaintiff to transfer approximately $5,200 worth of stock from an account with Computershare Investment Services into an account with Princor, and then sell the stock and disburse the funds to Decker. (Giddings Aff. ¶¶ 6-8). The reason for transferring the shares prior to selling them was to avoid the exorbitant fees Decker would incur had he sold it through Computershare. (Id.). On September 18, 2006, plaintiff, under pressure from Decker to complete the transaction, contacted Princor to learn the source of the hold up. (Id. ¶¶ 8-9). Princor informed plaintiff that there was a form missing from Decker's application. (Id.). Plaintiff thereafter contacted Computershare and

Case 2:07-cv-00370-JPS   Filed 03/18/09   Page 2 of 23   Document 61

discovered that Decker had been mistaken about the cost of selling the stock through Computershare, that in fact it was cheaper to sell through Computershare than through Princor. (Id. ¶ 9). Unable to contact Decker, and anxious to get the stock sold as soon as possible, as Decker adamantly wanted, plaintiff called Computershare, identified himself as Andrew Decker,[2] and ordered the stock sold and the funds sent to Decker. (Id. ¶¶ 10-12). Because of the nearly two week delay from the time Decker instructed the stock be transferred and sold until the time the stock was actually sold, Decker contacted Principal and registered a complaint. (Id.). There is no indication Decker's complaint had anything to do with the fact that plaintiff sold the stock through Computershare or the fact that plaintiff identified himself as Decker to Computershare. (Id. ¶¶ 11-12).

In response to Decker's complaint, Ms. Tenpas of Principal contacted plaintiff, at which time plaintiff informed her that he had identified himself to Computershare as Decker in order to expedite the trade. (Id. ¶ 12). Principal thereafter sent plaintiff a letter of reprimand, dated November 6, 2006, signed by Mr. Krueger, Regional Vice President. (Id., Ex. C). The letter of reprimand was for "impersonat[ing] Andrew Decker in the transaction without his consent," and it directed plaintiff to pay a $2,000 fine, (Id., Ex. C), which was authorized by plaintiff's contract with Princor, which gave Princor the right to "censure or fine [plaintiff], or terminate [plaintiff's

---

[2]In plaintiff's deposition, he attempts to backtrack from his admission that he identified himself as Mr. Decker (stating he can't remember if he did or not); however, Computershare's records, plaintiff's affidavit, and plaintiff's response to Tenpas's October 9, 2006, email (Johnson Decl., Ex. A, Ex. 8) all demonstrate that he did in fact identify himself as Decker. At the very least, this evidence proves that Principal, at all times relevant, was operating on the belief that plaintiff had done so, for plaintiff did not call this fact into question until his deposition.

contract] . . . if [Princor] determine[s] that [plaintiff] ha[s] committed any . . . dishonest . . . acts." (Reuter Decl., Ex. A). Accordingly, plaintiff paid the fine. (Giddings Aff. ¶14). The letter of reprimand also informed plaintiff that "[a]ny future concerns could result in further sanctions being taken against [him], up to, and including termination of [his] contracts with Princor and Principal Life." (Id., Ex. C). Indeed, it was later decided that plaintiff's actions merited more serious sanctions, and plaintiff was informed in a November 20, 2006 conference call with his superiors at Principal that his contract as a career agent with Principal Life would be terminated, as would his appointments with Principal Life.[3] (DPFOF ¶ 28; Johnson Decl., Ex. A at 76-80). Additionally, during this meeting, plaintiff was given the option of either resigning or being terminated. (DPFOF ¶ 31; Johnson Decl., Ex. A at 76-80). According to plaintiff, he was told by his superiors during that conference call that if he resigned the entire matter would be kept internal to Principal, and that no information pertaining to the events involving Decker would be released to any other organizations. (Giddings Aff. ¶ 16). Plaintiff submitted his letter of resignation the following day, November 21, 2006. (Giddings Aff., Ex. E).

On November 29, 2006, Principal sent out four letters – one to the Wisconsin Insurance Commissioner, one to the Illinois Insurance Director, one to the Indiana Insurance Commissioner, and one to the Iowa Insurance Commissioner. (Giddings Aff., Exs. I, L). Each of those letters stated in pertinent part:

---

[3]"An appointment is the official authorization from an insurance company granting an agent the authority to act as it's agent." (Defs.' Br. Supp. Mot. S.J. at 6) (*citing* John S. Bickley & Robert W. Osler, *Glossary of Insurance Terms*, 11 (Thomas Green ed., Merritt Co. 1997)).

Mr. Giddings' affiliation as a career insurance agent with Principal Life Insurance Company was terminated effective November 29, 2006 after he resigned.

Our company is notifying you of Mr. Giddings' appointment termination, as the reason for termination is one of the reasons set forth in [the applicable section of the State Code]. Specifically, we have a good faith reason to believe that this producer used dishonest practices in working with a customer and demonstrated untrustworthiness in the conduct of business when he admitted he impersonated a client without the client's consent in the sale of stock. Mr. Giddings did not benefit financially from his impersonation of the client, and the client received all funds due.

(Giddings Aff., Exs. I, L). Principal claims to have sent these letters with the understanding that they were required by each one of these states' insurance regulation laws. (Defs.' Br. Supp. Mot. S.J.). Plaintiff claims that these letters amounted to a breach of the "contract" he had with Principal, whereby he would resign, and Principal would keep the entire matter internal. (Compl. ¶¶ 15-17). Plaintiff also claims that these letters defamed him. (Id. ¶¶ 18-19). Lastly, plaintiff claims that by terminating his appointment with Principal, Principal tortiously interfered with his business relations with others, because plaintiff could no longer sell Principal products, which prevented plaintiff from taking over other Principal agent's business, as well as continuing to service his own clients. (Id. ¶¶ 20-21).

## II.  ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material

facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 317. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255.

## B. Breach of Contract Claim

Count I of plaintiff's complaint is for breach of contract. (Compl. ¶¶ 15-17). The contract that was allegedly breached was Giddings' "agreement with [Principal] to resign in exchange for [Principal's] promise that it would keep its investigation internally and not report its version of the facts or its opinions to any outside entities, including self regulatory agencies or state agencies." (Id. ¶ 15). "In determining whether a valid agreement arose between the parties, a federal court should look to the state law that ordinarily governs the formation of contracts." *Koveleskie v. SBC Capital Markets, Inc.*, 167 F.3d 361, 367-68 (7th Cir.1999). As the plaintiff was employed in Wisconsin, and his forced resignation took place in Wisconsin, Wisconsin law applies. *Id.* at 368. Under Wisconsin law "[a] valid contract requires an offer, acceptance, and consideration." *Piaskoski & Associates v. Ricciardi*, 686

N.W.2d 675, 658 (Wis. App. 2004). A factual question exists in this case as to whether there was an offer and acceptance. (Defs.' Reply PPFOF at 4). However, no factual dispute exists as to whether there was consideration. This is because, even if all of plaintiff's alleged facts are true, they do not support a finding that there was any consideration for the alleged contract.

"The consideration necessary to support an agreement may consist of a detriment to the promisee or a benefit to the promissor. *Lovett v. Mt. Senario College, Inc.*, 454 N.W.2d 356, 358 (Wis. App. 1990). Plaintiff advances two arguments as to the existence of consideration. Plaintiff's first argument is that plaintiff's resignation did have detriment for plaintiff and benefit for Principal. The alleged detriment was that plaintiff "gave up his income, including renewal commissions, when he resigned as well as any unemployment compensation." (Pl. Br. Opp. Mot. S.J. at 9). This argument ignores the facts. The facts are that plaintiff had only two choices: resign or have his contract terminated (being "fired" essentially). Under both of those scenarios he would have lost his income, renewal commissions, and any claim he *may* have had for unemployment benefits[4] (according to Wis. Stat. § 108.04(5), employees terminated for misconduct – which is what plaintiff would have been terminated for – are ineligible to receive

---

[4]As defendants point out, plaintiff does not refute, and the record clearly indicates, plaintiff was an independent contractor. (Defs.' Reply Br. Supp. Mot. S.J. at 10). Independent contractors are not "employees" (Wis. Stat. § 108.02(12)), and thus are not entitled to unemployment benefits (Wis. Stat. § 108.03). To the extent plaintiff may, possibly but not likely, convince a judge somewhere that he had in fact been an employee, the fact remains that he would have been terminated for misconduct (impersonating a client) and thus still ineligible.

unemployment benefits). Thus, because plaintiff's only two options would have caused these detriments, plaintiff did not incur these detriments as a result of his decision to resign, he incurred them as a result of his decision to identify himself to Computershare as Andrew Decker. In fact, not only did plaintiff not incur any detriment as a result of his decision to resign in lieu of being fired, he in fact only incurred benefits therefrom, namely the ability to avoid having to report to future employers that he was fired. However, for his resignation to serve as consideration, since it caused him no detriment, it would have to confer a benefit on Principal, not merely himself. Yet, his resignation was of no benefit to Principal. Every indication is that Principal merely offered plaintiff that option as a gratuity. It is plaintiff's position that his resignation was a benefit to Principal because had he not resigned he would have "looked into whether he had a discrimination claim against the defendants." (Pl. Br. Opp. Mot. S.J. at 10). This allegation is not supported by any facts, or even arguments, anywhere in the record suggesting that plaintiff would have had any basis for a discrimination claim, or that plaintiff's forced resignation cost him the right to look into whether he had such a claim.[5] Plaintiff's slightly alternate argument is that the consideration was an exchange of mutual promises, plaintiff's promise to resign for defendants' promise not to disclose the reason for the resignation. This argument fails on one level because it simply is not true, plaintiff's affidavit demonstrates that the alleged consideration was his resignation, not a

---

[5]Plaintiff learned of defendants' alleged breach in mid-December 2006 when he received a letter, dated December 12, 2006, from the Insurance Commissioner of Iowa in regards to the letter sent by Principal. (Giddings Aff. ¶24). Thus, plaintiff learned of the alleged breach less than thirty days after resigning, which means he was still well within the applicable statute of limitations to bring a discrimination claim.

promise to resign. (Johnson Decl., Ex. A at 79-80; Reuter Decl., Ex. A at 88). The argument also fails on a more fundamental level, because the fact remains that there is still no value (no detriment to plaintiff or benefit to defendants) underlying those promises. Plaintiff argues that it is irrelevant whether the promises were "valueless" and cites *Chudnow Construction Corp. v. Commercial Discount Corp.*, 180 N.W.2d 697 (Wis. 1970) to support this contention. In *Chudnow*, the plaintiff contended that a defendant's promises to deliver lien waivers could not serve as consideration because the defendant had no lien rights, thus the promises were worthless. 180 N.W.2d at 699. Yet, a party does not necessarily have to have lien rights in order to fulfill a promise to deliver lien waivers. Also, as the court in *Chudnow* pointed out, there was no evidence that the waivers were worthless, but if they turned out to be, then that meant plaintiff had made a "bad bargain." *Id.* Thus, the plaintiff in *Chudnow* could no more shirk its contractual obligations than a man purchasing a lottery ticket could refuse to pay if the lottery ticket was not a winner, and was thus "worthless." However, in the instant case, plaintiff's promise to resign, unlike the lien waivers or the lottery ticket, never had the potential of any value for defendants. Defendants would have always been in the same situation whether plaintiff performed according to the alleged contract (resigned) or whether he failed to perform, and was fired. Accordingly, there was clearly no consideration underlying the alleged contract, and thus, even if there were an offer and acceptance, it was still not an enforceable agreement.

Even if there had been sufficient consideration, thus making the parties' agreement a contract, it would still not be an enforceable contract, because enforcing it would violate the law. *See Antisdel v. City of Oak Creek Police and Fire Com'n*, 600 N.W.2d 1, 3 (Wis. App. 1999) ("Agreements and practices that conflict with a statute . . . must give way; the statute controls."). The applicable state codes that compelled Principal to mail the letters, thus breaching the alleged contract, include 215 Ill. Comp. Stat. §§ 5/500-85(a), 500-70(a)(8); Ind. Code §§ 27-1-15.6-15(a), 6-12(b)(8); Iowa Admin. Code §§ 522B.11(1)(h), 522B.14(1); Wis. Admin. Code Ins. §§ 6.57(2)(a), 6.59(5)(d)(8). Illinois Code § 5/500-85 requires that "[a]n insurer . . . that terminates the appointment, employment, contract, or other insurance business relationship with a producer must notify the Director within 30 days . . . if the reason for termination is one of the reasons set forth in Section 500-70." Section 500-70(a)(8) lists: "using fraudulent . . . or dishonest practices." The requirements placed upon the insurer by the other three applicable state codes are substantively identical to the requirements set forth in the Illinois code. The parties agree that Principal did *not* terminate plaintiff's employment; rather, he resigned. However, the parties also agree that Principal *did* terminate plaintiff's appointment. (Pl. Br. Opp. Mot. S.J. at 1) ("Mr. Giddings resigned. Principal Life terminated his appointment taking away his clients."); (Giddings Aff. ¶ 16 ("I agreed to resign and signed a letter of resignation."), ¶ 23 ("Principal Life intentionally terminated my appointment to sell Principal's products.")). Indeed, plaintiff does not dispute in his Sur-Reply defendants' argument that Principal terminated his appointment, and that

-10-

it was that action, and not his resignation, that triggered the reporting requirement. Plaintiff's only remaining argument on the matter appears to be that because Principal (via the Princor subsidiary) did not report the matter to the securities industry regulators, that means that Principal (via Principal Life subsidiary) was not required to report the matter to the insurance industry regulators. (Pl. Br. Opp. Mot. S.J. at 5-6; Pl. Sur-Reply Br. at 3-4. This argument is a complete non-starter for one has nothing to do with the other. Perhaps the different regulators have different disclosure requirements; perhaps Princor violated the law. Whatever the reason, the lack of disclosure to the securities regulator is completely irrelevant to the question of whether the above described state statutes required disclosure in this instance – which they clearly on their face do require. Thus it would have been illegal for Principal to conform to the terms of the alleged contract. Accordingly, even if it had been a contract supported by consideration, it would have still been unenforceable, thus Principal cannot be liable for breaching it.

Plaintiff's breach of contract claim fails because there was no contract, as any alleged agreement that existed was not supported by consideration. Even if there had been adequate consideration, the claim would still fail, because the contract would not have been enforceable due to the fact it would require defendants to violate state laws. Lastly – and for the sake of efficiency the court will not dwell on this – plaintiff has sustained no damages as a result of the breach. Plaintiff testified at his deposition that per the terms of his alleged contract with Principal, he would have incurred the same "damages" as he incurred as a result of the breach. (Reuter

Decl., Ex. A at 145). This is because Principal was going to terminate his appointment whether he resigned or whether he was fired. Thus, as far as "damages" are concerned, plaintiff remains in the same position now as he would have been had he never made the contract. Any of the foregoing reasons provides adequate ground for granting defendants summary judgement as to plaintiff's breach of contract claim.

The foregoing analysis details the numerous reasons why defendants are entitled to summary judgment as to the breach of contract claim in the Complaint. However, plaintiff, in his opposition brief, seeks to add an additional breach of contract claim to his allegations. (Pl. Br. Opp. Mot. S.J. at 1). This new claim is based on an entirely different alleged contract. Plaintiff claims that prior to the above described "contract," there was an earlier contract between the parties whereby plaintiff would sign the letter of reprimand and pay a $2,000 fine, and that would be the end of the matter. (Id.). Ostensibly, Principal breached this contract when it later came back and decided to take further action. (Id. at 1-2).

Regardless of the merits, or lack thereof,[6] of plaintiff's new breach of contract claim, he cannot now, at the summary judgment phase of the proceedings, seek to add new claims to the Complaint. The Complaint clearly sets out three claims for relief, one of which is a claim for breach of contract; nowhere within the "breach of contract" section of the Complaint is there any mention of this first supposed

---

[6]For the sake of thoroughness, the court notes that even if this new breach of contract complaint were properly alleged, it would fail on the merits. The terms were unilaterally imposed, there was no offer, and the "consideration" was simply plaintiff doing what was already required of him.

contract. (Compl. ¶¶ 15-17). In fact, the only mention in the Complaint of anything pertaining to this new claim, is one sentence in the "background" section which reads: "Initially, The Principal Group sent Mr. Giddings a letter of reprimand." (Id. ¶ 11). This clearly neither alleges the existence of a contract based on that occurrence, nor the breach of said contract. Plaintiff contends that in answer to his interrogatories he stated he "was going to accept the reprimand and pay the fine." (Pl. Sur-Reply Br. at 1) (*quoting* Johnson Decl., Ex. B at 4). Also, at his deposition he testified:

> I was going to be given a letter of reprimand and an internal fine, and everything would be taken care of inside the realm of Principal. I would need to put the letter of reprimand in my file, pay the fine within a reasonable parameter of days. . . and then I should just move forward with my business and put the situation behind me.

(Pl. Sur-Reply Br. at 1-2) (*quoting* Lanphier Aff., Ex. 4 at 73). Again, this evidence does not suffice in an attempt to further bolster the existence of a contract, because plaintiff was already obligated, per the terms of his actual contract with Principal, to comply with these requirements. (Reuter Decl., Ex. A, Ex. 1). As defendants correctly point out: "A party does not provide consideration by doing that which the party is already obligated to do." (Defs.' Reply Br. Supp. Mot. S.J. at 4-5) (*citing Holcomb v. United States*, 622 F.2d 937, 941 (7th Cir. 1980)). Accordingly, plaintiff at no time prior to his opposition brief even alleged a separate contract pertaining to the letter of reprimand. Because "complaints in federal courts are still subject to the notice-pleading standard of [Fed. R. Civ. P. 8(a)]" plaintiff's "complaint must provide enough detail to give fair notice of what his claim is and the grounds upon which it

rests so that [defendants] may respond." *Moore v. F.B.I.*, 283 Fed. Appx. 397, 399 (7th Cir. 2008). Any argument that the passages in the letter of reprimand would put defendants on notice as to a contract claim arising therefrom are completely undermined by plaintiff's deposition testimony in which he was asked about his breach of contract claim:

> Q: Mr. Giddings, in your complaint in this lawsuit, you allege a breach of contract claim, correct?
>
> A: Yes.
>
> Q: And what were the terms of the contract that you claim was breached?
>
> A: Mr. Cecere and Mr. Krueger, who were both superiors to me in the organization, said that if I put in my letter to resign, that everything would be kept internal to Principal, that nothing would need to be reported, there would be no outside mention of this, it would all be treated as an internal situation, and I would be able to go on with my career.
>
> Q: Were there any other terms?
>
> A: I would not be able to sell Principal products any longer.
>
> Q: Anything else?
>
> A: Not that I'm aware of, or can recall.

(Johnson Decl., Ex. A at 79-80). Since Giddings did not put defendants on notice as to this claim, he may not now introduce it into the proceedings. *See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").

-14-

## C. Defamation Claim

Plaintiff's complaint further alleges that Principal defamed plaintiff "when it stated in letters to at least four state agencies that he had engaged in 'dishonest practices.'" (Compl. ¶ 18). Because defamation is a tort claim, it is governed by state law. However, the fact that the contract claim is governed by Wisconsin law does not necessarily mean that the tort claim should be as well. *International Administrators, Inc. v. Life Ins. Co. of North America*, 753 F.2d 1373, 1376 n.4 (7th Cir. 1985) ("The choice of law is not made once for all issues; the trend is to decide the applicable law for each issue separately."). Defendants claim that "[i]n federal court, '[i]n an action for libel or slander, the substantive law of the forum state governs the merits of the claims.'" (Defs.' Br. Supp. Mot. S.J. at 15) (*quoting Thompson v. Kiekhaefer*, 71 F.R.D. 115, 116 (E.D. Wis. 1976)). Plaintiff apparently agrees since he takes no exception to the defendants' position on the matter. Despite the parties' apparent unanimity on the subject, the court is not prepared to accept it as axiomatic that simply because this court sits in Wisconsin, that Wisconsin law should apply to the letters sent to Illinois, Iowa and Indiana. While it is true that "[i]n diversity a federal court must look to the law of the forum in which it sits for substantive law," neither the courts nor the parties should forget that this "includ[es] the rules governing choice of law." *International Administrators*, 753 F.2d at 1376 n.4. The Wisconsin choice of law "methodology applicable to tort cases begins with a presumption that the law of the forum applies unless 'nonforum contacts are of the greater significance,' and ends with an analysis of five 'choice

influencing factors': predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law." *Glaeske v. Shaw*, 661 N.W.2d 420, 427 (Wis. App. 2003) (*citing State Farm Mut. Auto. Ins. Co. v. Gillette*, 641 N.W.2d 662, 676 (Wis. App. 2003). Before analyzing the proper outcome under this methodology, the court concedes that "[c]onflicts rules are appealed to only when a difference in law will make a difference to the outcome," 753 F.2d at 1376 n.4, and that no evidence has been presented to indicate that applying Indiana, Illinois or Iowa law would affect the outcome. Nor has there been any evidence presented to demonstrate that applying one of those state's laws would not affect the outcome. For the sake of efficiency, instead of analyzing the law of each of those states, the court will simply note that, under the Wisconsin choice of law methodology previously set forth, Wisconsin law does apply because the single nonforum factor (location of the insurance regulators contacted) does not outweigh the law of forum presumption. Furthermore, the five "choice influencing factors" weight in favor of Wisconsin law, particularly the advancement of the forum's governmental interest factor, as plaintiff lives in Wisconsin, and his relationship with defendants is rooted in Wisconsin. Accordingly, the court will apply Wisconsin law to plaintiff's defamation claim.

Under Wisconsin state law, a defamation claim has three elements:

(1)    the statement must be false;

Case 2:07-cv-00370-JPS   Filed 03/18/09   Page 16 of 23   Document 61

  (2)  the statement must be communicated by speech, conduct or in writing to a person other than the person defamed; and

  (3)  the communication must be unprivileged and tend to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her.

*Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007) (*citing Torgerson v. Journal/Sentinel, Inc.*, 563 N.W.2d 472, 477 (Wis. 1997)). Plaintiff's defamation claim fails on the first and the third element. The first element requires falsity, thus, if a statement is true or "substantially true, a libel action will fail." *Torgerson*, 563 N.W.2d at 477. The alleged defamatory statement, according to plaintiff's complaint, was Principal's statement that plaintiff "engaged in 'dishonest practices'". (Compl. ¶18). At the outset, the court points out that the alleged defamatory letters did not state that plaintiff engaged in dishonest practices; the letters stated: "we have a good faith reason to believe that this producer used dishonest practices in working with a customer." (Giddings Aff., Ex. I, L). The facts establish that plaintiff identified himself to Computershare as Andrew Decker, and then went on to supply Decker's information to Computershare as though he were Andrew Decker. (Johnson Decl., Ex. A at 53-56, 60-61, 65). Plaintiff is not Andrew Decker; thus, by representing himself to be someone else, he was engaged in dishonest practices. More to the point, defendants had a good faith reason to believe he had done as much. In fact, plaintiff's briefs do not even try to explain how this statement could be construed as untrue. Furthermore, any possible misinterpretation by the reader that this was an ongoing scheme of some kind would be ameliorated by the letters' reference to the

-17-

fact that this occurred with "a customer" (singular), and that plaintiff "did not benefit financially from his impersonation of the client and the client received all funds due." (Giddings Aff., Ex. I, L). Because Principal's statement was clearly true, and undeniably "substantially true," plaintiff cannot satisfy the first element of a defamation claim. Thus, his claim fails.

Independent of the first element is the necessity to satisfy the third element of a defamation claim, specifically in this instance, that the communication be unprivileged. This is because Principal's submissions to the insurance regulatory bodies were privileged communications. *Shier v. Denny*, 107 N.W.2d 611, 613, (Wis. 1961) ("The great weight of authority is to the effect that the proceedings before administrative agencies are absolutely privileged."). Wis. Stat. § 601.42(6)(b) produces the same result. The statute states: "In the absence of actual malice, no communication to the commissioner or office required by law . . . shall subject the person making it to an action for damages for the communication." As described in the breach of contract section, these communications were required by the applicable state statutes, thus they were privileged, not only because of Wis. Stat. 601.42(6)(b), but also because "[o]ne who is required by law to publish otherwise defamatory matter is absolutely privileged to publish it." Restatement (Second) of Torts § 592A (1977). Accordingly, Principal's communications were privileged, thus plaintiff's allegations fail to satisfy the third element of an otherwise valid defamation claim.

Though the only language plaintiff identifies in his complaint as being defamatory is the "dishonest practices" language, plaintiff subsequently attempts to impliedly amend his defamation claim by adding allegations that other portions of the letter were defamatory as well. These allegations can be found in plaintiff's deposition testimony where he identified the following additional portions of the letters as defamatory: "demonstrated untrustworthiness in the conduct of business," and "he admitted he impersonated a client without the client's consent in the sale of stock."[7] In fact, the only argument plaintiff makes in his opposition brief as to the falsity of a statement is in regards to this latter statement. Plaintiff claims "the statement in [the] letters was that the sale of stock was 'without the client's consent.'" (Pl. Br. Opp. Mot. S.J. at 12). This is a misrepresentation of the letter. The letter states that the impersonation of the client, which occurred during the sale of stock, was without the client's consent. Thus, the letter is clearly true, for plaintiff even admits that Andrew Decker did not consent to allowing plaintiff to impersonate him. (Johnson Decl., Ex. A at 24). However, this entire discussion as to whether any statement other than the "dishonest practices" statement was defamatory is moot, for no other statements were alleged as defamatory in the Complaint. Wisconsin law requires that "[i]n an action for libel or slander, the particular words complained of shall be set forth in the complaint." Wis. Stat. § 802.03(6). Thus only the "dishonest

---

[7]Plaintiff also took umbrage with the opening line which states that his "affiliation as a career insurance agent with [Principal] was terminated effective November 29, 2006, after he resigned." He claims the statement is untrue because he was not terminated, he resigned. (Johnson Decl., Ex. A at 122). This argument misreads the statement. The statement says his affiliation was terminated, which is true. Had plaintiff resigned as a career insurance agent, yet retained his appointment with Principal, his affiliation would have continued. When his appointment was terminated, so too was the affiliation.

practices" language was properly alleged, and any other allegations are untimely, especially considering the fact that the additional statements sought to be added to the Complaint were in the same letters as the properly alleged statement – thus there can be no allegation that plaintiff only later learned of these statements. Accordingly, for the reasons stated above, the court finds that defendants are entitled to summary judgement as to plaintiff's defamation claim.

### C.    Tortious Interference Claim

The third claim in plaintiff's complaint is a claim that defendants tortiously interfered with plaintiff's "agreement to take over the business and clients of other Principal agents."  (Compl. ¶ 20).  Wisconsin law would apply to this claim, per the previously described choice of law methodology applicable to tort claims.  Supra at 15.  Under Wisconsin law the elements of tortious interference with a contract include:

(1)    the plaintiff had a contract or prospective contractual relationship with a third party;

(2)    the defendant interfered with the relationship;

(3)    the interference was intentional;

(4)    a causal connection exists between the interference and the damages; and

(5)    the defendant was not justified or privileged to interfere.

*Dorr v. Sacred Heart Hosp.*, 597 N.W.2d 462, 478 (Wis. App. 1999).  While plaintiff's tortious interference claim fails to raise an issue of material factual dispute as to several of these elements – and indeed even fails to properly allege any factual

basis for elements three and five – the court will confine its analysis to element five. Giddings' claim fails overcome this element because, "[a] party has a right to protect what he believes to be his legal interest." *Briesemeister v. Lehner*, 720 N.W.2d 531, 544 (Wis. App. 2006). Clearly, Principal has a legal interest in controlling who represents it and who sells its product, and clearly Principal has a legal interest in ensuring those individuals comply with the highest ethical standards. Indeed, plaintiff's contract with Principal clearly articulated that either party could "terminate [the] contract at any time for any reason" and that Principal "reserve[d] the right to revoke [plaintiff's] authority to sell any product or product line at any time, upon notice to [plaintiff]." (Johnson Decl., Ex. A, Ex. 4). Because Principal was protecting its legal interest, simply by exercising its valid contractual rights, it cannot be liable for tortious interference. Indeed, defendants cite voluminous case law supporting the axiom that "a party cannot commit tortious interference by exercising a right granted to it in a contract." (Defs.' Br. Supp. Mot. S.J. at 23). Yet plaintiff's only response is to state: "In Wisconsin 'there can be tort liability for interference with a contract terminable at will.'" (Pl. Br. Opp. Mot. S.J. at 14) (*citing Charlois Breeding Ranches, Ltd. v. FPC Securities Corp.*, 279 N.W.2d 493, 496-97 (Wis. App. 1979)). This contention, though true, is completely unrelated to any issue relevant to plaintiff's case. There is no allegation of any interference between plaintiff's contract with Principal, nor is there any issue pertaining to the at-will nature of plaintiff's existing or potential contracts with third parties. Plaintiff's use of this contention, and no other, to show a material issue as to element five – after Principal has already

-21-

more than met its burden of proof as to element five – evidences the disingenuousness of this tortious interference claim. Indeed, plaintiff has not even alleged any improper conduct on Principal's part (unless the exercise of a contractual provision is "improper"), yet Principal's conduct would have to be improper in order for a claim of tortious interference to lie. *Liebe v. City Finance Co.*, 295 N.W.2d 16, 18 (Wis. App. 1980). Accordingly, defendants are entitled to summary judgement as to plaintiff's tortious interference claim.

## III. CONCLUSION

Plaintiff's breach of contract claim fails because the contract was not supported by any consideration. Were that not true, the claim would still fail because an illegal contract is unenforceable. Were that not true, the claim would still yet fail because plaintiff did not suffer any damages as a result of the breach. Plaintiff's defamation claim fails because Principal did not publish a false statement. Additionally, the claim also fails because Principal was privileged to publish the information it published. Lastly, plaintiff's tortious interference claim fails because plaintiff has not pled any facts to support a finding that any of the last three elements of such a claim are met; further, Principal was privileged to act as it did.

Accordingly,

**IT IS ORDERED** that plaintiff's 7.4 Motion for Leave to File Sur-Reply (Docket #55) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that defendants' First Motion for Summary Judgment (Docket #27) be and the same is hereby **GRANTED**;

-22-

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED** on its merits, with prejudice, together with costs as taxed by the Clerk of the Court.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 18th day of March, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge